MRS. KATE ZIMMERMAN, WIDOW, MRS. KATE ZIMMERMAN, MOTHER AND NEXT FRIEND OF EDWARD ZIMMERMAN, SON, AND MARTIN ZIMMERMAN, SON, OF EDWARD ZIMMERMAN, DECEASED; ANNE PARRISH, WIDOW OF JOSEPH PARRISH; AND AUDREY L. BRICKHOUSE v. ELIZABETH CITY FREEZER LOCKER, EMPLOYER, AND ROYAL INDEMNITY COMPANY, CARRIER.

(Filed 31 October, 1956.)

**1. Master and Servant §§ 40c, 40d—**

In order to be compensable under the Workmen's Compensation Act, an injury must result from an accident "arising out of and in the course of the employment," and the words "out of" refer to the cause of the accident, while the words "in the course of" have reference to the time, place and circumstances under which it occurs.

**2. Master and Servant § 40d—**

An accident arises "in the course of" the employment if at the time the employee is at his place of work performing the duties of his employment.

**3. Master and Servant § 40d—Evidence held sufficient to support finding that shooting of fellow employees arose out of the employment.**

The evidence tended to show that an employee, because of a mental disturbance, had diffuse feelings of hatred against people generally, that because of bickerings and altercations arising in connection with the employment, he had animosity against certain of his fellow employees in particular, that due to an incident when the employee reported to his draft board, the employee became exceedingly angry, went to the room where he lodged, procured a gun, and went to the place of his employment where he shot three fellow employees, fatally wounding two of them. The employee made a statement to the effect that he did not attempt to kill anyone on the street on his way to his place of employment because he preferred to kill someone at the plant whom he knew. *Held:* Notwithstanding that the incident at the place of the draft board "triggered" the mental disturbance of the employee, there was evidence of a causal connection between the

shooting of the fellow employees and the employment, there being no evidence that the assailant had any contacts with them outside of the employment.

JOHNSON, J., not sitting.

APPEAL by defendants from *Grady, Emergency Judge,* March Term, 1956, of PASQUOTANK.

These three claims for compensation under our Workmen's Compensation Act were consolidated for hearing. They arose as a result of the killing of Edward Zimmerman and Joseph Parrish, and the injury of Audrey L. Brickhouse, by a fellow employee, Robert Jordan, on 9 September 1954.

When this cause came on for hearing before the deputy hearing Commissioner, the parties entered into the following stipulations:

1. That all parties are subject to and bound by the provisions of the North Carolina Workmen's Compensation Act; that the defendant employer employs more than five persons.

2. That on the day giving rise to these claims, the deceased Edward Zimmerman and the deceased Joseph Parrish and the claimant Audrey L. Brickhouse were employees of the defendant employer; that the relationship of employer-employee existed between the defendant employer and said parties on said date.

3. That Edward Zimmerman and Joseph Parrish died as a result of bullet wounds received from the rifle of Robert Jordan on 9 September 1954.

4. That the average weekly wage of the deceased Edward Zimmerman was $60.00; the average weekly wage of the deceased Joseph Parrish was $60.00; and the average weekly wage of Audrey L. Brickhouse was $41.25.

The evidence discloses that Robert Jordan (referred to in the evidence as Jordan or Bobby), was 18 years of age when he went to work for the defendant employer in 1950; that he was employed by J. W. Collins, the manager of the Elizabeth City Freezer Locker plant, as an apprentice meat cutter; that the employee worked for his employer regularly until the summer of 1953 when his foreman, Warren Riggs, discharged him. Riggs fired him because he gave him an order to fill for a customer and Jordan told him if he wanted it filled, to fill it himself, and a few minutes later Jordan jumped up and rushed at him with a six-inch boning knife in his hand. Riggs ducked past him and ran. Jordan called Riggs later and apologized and requested his job back, but Riggs declined to re-employ him at that time.

Some time later some of the customers of the defendant employer became interested in Jordan and requested that he be re-employed. The manager of the defendant employer gave his approval to the re-

employment and Jordan returned to work. The manager testified that Jordan was hot tempered; that he had seen him lose his temper on occasions, he could not say how many; that his worst problem with Jordan had been that when he got mad he would take a piece of equipment and throw it on the floor and break it; that on one occasion he took an automatic tape machine which cost $27.00 and threw it on the floor and broke it because he got mad about something. The manager further testified that he had numerous complaints from some of the personnel about Jordan when he was working there in 1951, 1952, and 1953.

Only a few weeks before the shooting, the evidence tends to show that a very heated argument took place between Jordan and Zimmerman; that it was part of Zimmerman's duties to maintain and repair certain equipment. The manager heard the argument and immediately went to investigate the trouble. He heard part of the conversation. Zimmerman said, "there is absolutely no sense in Bobby throwing a piece of meat down on this salt carrier so hard and tearing it up; I just repaired it a few days ago for the same trouble, now I'll have to do it again." Bobby said, "now look here, G— d— it, don't jump all over me, it is none of your d— business what I do." Bobby then took up a knife, and the manager told Zimmerman to go back to his work. The manager then called Bobby off and talked to him for some ten minutes and reminded him of the tape machine and the other equipment he had broken as a result of his temper and that it would have to stop. He apparently got in a good humor and returned to work. There is evidence, however, that Jordan said shortly after his argument with Zimmerman and as he returned to work after Collins talked to him, "G— d— it, I will get you one way or the other."

About six weeks prior to 9 September 1954, Jordan began to skylark with the deceased Parrish. Parrish, instead of participating in the skylarking or horseplay, reprimanded Jordan for throwing a pork loin at him and knocking off his glasses; whereupon, they had an argument and Jordan became extremely angry and remained so for some time. Later, however, he appeared to be on friendly terms with Parrish.

The evidence further tends to show that one of the duties of the claimant, Miss Brickhouse, consisted of relaying orders received from customers to other employees. She would frequently relay such an order to Jordan, whose duty it was to take the order and fill it. During certain hours of the day, Miss Brickhouse would give Jordan a considerable number of orders in a very short time; that on such occasions Jordan would often become angry and curse her because she gave him the orders; that Jordan resented taking orders from Miss Brickhouse.

The evidence also tends to show that Jake Cox was working with Jordan on one occasion when Jordan got mad because he had difficulty

in cutting a hog, the saw got hung up and he took it and threw it to the opposite end of the corridor. Cox reported him and refused to work with him because of his temper. Jordan got mad with Cox because he reported him. This event occurred about three weeks before the shooting.

Shortly before 9 September 1954, Jordan received a notice to report to his draft board for induction into the Armed Services. He reluctantly reported to the local board pursuant to the notice, but did not do so until the local board called his employer. When he arrived at the office of the local board, he was severely reprimanded by a lady clerk in charge of the office, in the presence of several fellow draftees, for being late in reporting. The fellow draftees began to kid Jordan, whereupon, he became extremely angry with the lady clerk, walked out of the office of the draft board without being examined, and returned to his rooming house. This was about 8:00 a.m., 9 September 1954. Jordan loaded his .22 automatic rifle and walked four blocks from his rooming house to his place of employment; that he saw several persons on and along the street as he walked toward the Freezer Locker; that he did nothing and said nothing to the people he saw, except to a taxi driver whom he knew he waved a hand of greeting.

The front lobby of the defendant employer's plant was used at the time as a sales room; it was approximately 15 feet wide and 53 feet long, and there was a long corridor to the left of the lobby which was about 12 feet wide and 45 feet in length. Jordan walked into the lobby from the front door, he saw the claimant, Miss Brickhouse, behind the counter to his left, and fired at her twice, one bullet missed her and the other struck her in the right shoulder. Miss Brickhouse fell to the floor and Jordan walked from the lobby into the corridor; as he walked through the door he met the deceased Parrish and shot and killed him. He then saw Riggs but made no effort to kill his foreman. There were some ten people in the corridor, most of whom were customers. He saw Cox and began shooting at him, firing the rifle from his hip. None of the bullets hit Cox, but a stray bullet struck and killed Alec Johnson, a customer.

After the people had run from the corridor, some of them leaving by the rear door, Cox and others escaping into the refrigeration room, Jordan returned to the front lobby where he met Zimmerman and shot and killed him. He then went to a rear room in the locker plant where he remained for approximately thirty minutes before surrendering to the local police.

W. C. Owens, a police officer, testified as follows: "On September 9, 1954, after the shooting down at the Freezer Locker, I talked to Bobby Jordan, approximately an hour and a half after the shooting, about 9:30. He stated that he had been to the local Draft Board and returned

to his home on Dyer Street where he got his rifle and proceeded down Dyer Street towards the Freezer Locker. At that point I asked him why he went to the Freezer Locker and why he killed the people in the Freezer Locker instead of someone else. He said he wanted to kill someone who (*sic*) he knew and I asked him did he see anyone he knew on the way to the Freezer Locker. He stated that he did, one person by the name of Sample, who is a taxi driver . . . At this point I asked him why he went to the Freezer Locker; why didn't he shoot Sample; he said, well, he'd rather kill someone there where he knew; I asked him for what reason; he said, well everybody dominates me . . ."

There is no evidence tending to show that any friction arose between Robert Jordan and any of his fellow employees over any matter except in connection with his employment.

Upon the stipulations and findings of fact, the deputy hearing Commissioner held that the injury to Miss Brickhouse and the injuries which led to the deaths of Edward Zimmerman and Joseph Parrish arose out of and in the course of their employment. Awards were made in favor of the claimants. The defendants appealed from these awards to the full Commission. The full Commission, after a hearing and review of all the evidence, findings of fact and conclusions of law, adopted the facts and conclusions found by the deputy hearing Commissioner and affirmed the awards.

The defendants appealed to the Superior Court, where each one of their exceptions was overruled and the cause remanded to the Industrial Commission to the end that it may proceed according to the course and practice of the courts. The defendants appeal, assigning error.

*J. W. Jennette for Mrs. Kate Zimmerman, et al.*
*M. B. Simpson for Mrs. Anne Parrish.*
*John H. Hall for Miss Audrey L. Brickhouse.*
*LeRoy & Goodwin and Smith, Moore, Smith, Schell & Hunter*
    *by: Stephen Millikin*
*for defendant appellants.*

DENNY, J. The appellants submit for our consideration and determination the following question: "Is there competent evidence in the record sufficient to support the findings and conclusions that the injuries and deaths of the employees in question arose out of and in the course of their employment with the defendant Elizabeth City Freezer Locker, as made by the hearing Commissioner and affirmed by the full Commission and the Superior Court?"

The record in this appeal presents a pathetic story. It tends to show that Robert Jordan had an unhappy early life. His mother died when he was five years of age, and he has not had a real home since. After

the death of his mother, he was sent from place to place to live with
relatives. Thereafter, for some time he lived with his father and step-
mother, but did not like his stepmother and left home when he was
about eleven or twelve years of age. He returned home later and for
a time lived with his father and second stepmother. He finished high
school in Elizabeth City in 1950. During his years of insecurity, he
developed a feeling of inferiority, which was made worse by his rejec-
tion by the Army in 1951. He experienced periods of moodiness and
depression which appeared with greater frequency following his rejec-
tion and he then underwent a period of general withdrawal from other
people, which withdrawal took the form of feelings of hatred toward
the world and a feeling that he had never been given a fair chance in
life. This emotional type of confusion was diagnosed by doctors at the
State Hospital in Raleigh as schizophrenia, and it was the opinion of
these doctors that Jordan "had developed a rather strong, diffuse, hos-
tile reaction or feeling of hatred toward people about him over a period
of years."

Robert Jordan's deposition was taken at the State Hospital in Ra-
leigh, North Carolina, in November 1954 and offered in evidence before
the hearing Commissioner. After reciting the many places he had lived,
he stated, "My father had divorced my first stepmother and had
remarried. I was 16 when I went to Elizabeth City. I lived with my
second stepmother two or three years. The second stepmother and I
had some arguments. I didn't see eye to eye with her on everything and
I couldn't stand being dominated by anybody." He named eleven
people with whom he had difficulty at the Freezer Locker plant, some
of whom had quit work there prior to 9 September 1954. Among those
named were Audrey L. Brickhouse, Edward Zimmerman, Joseph Par-
rish, J. W. Cox, Warren Riggs, his foreman, and J. W. Collins, manager
of the plant. He also told of a difficulty he had with a Mr. White with
whom he had boarded after he took the job at the Locker plant. He
testified, "I don't recall disagreements with anyone else that didn't work
at the freezer locker besides White and my father and stepmother. . . .
I had right much temper during this period. . . . I think after I got
out of high school it became a lot worse; I went to work. My temper
became worse. I had trouble controlling my temper when things didn't
go right. . . . I got so I didn't enjoy working . . . just didn't enjoy
working any time." With respect to his arguments with people at the
plant, he stated, "I would get over it. Generally, I wouldn't make the
first step to apologize to anybody." The witness continued, "Following
my rejection by the Army in 1951, I did not have any desire to enlist in
the Army or to be recalled. . . . I think I decided not to report before
I received the notice. . . . I swore I wasn't going. I took this oath
to myself."

On the night of 8 September 1954, Jordan wrote a letter, sealed it and wrote on the envelope, 'To be opened in the event of my sudden death or completely destroyed existence in this normal world." The letter was addressed "To WHOM IT MAY CONCERN," and the first paragraph read as follows: "I cannot escape my fate, the fate I was created for, I am a sheep among wolves, persecuted at every turn; alas, the world is completely against me. But persecution must end somewhere and I am confident it ends with the grave." There were four other paragraphs in similar vein. The witness testified that after the lady "bawled" him out at the draft board, he lost his head and left. "I think I pretty much realized what I was doing after that. . . . I had in mind when I was walking on back to kill somebody. That idea first came in my mind right after I left the draft board.'

Dr. Marion M. Estes, who was admitted to be a medical expert specializing in psychiatry, and who is connected with the State Hospital in Raleigh, testified before the hearing Commissioner. It appears from his testimony that Jordan was admitted to the State Hospital on a court order for psychiatric observation and examination; that approximately fifteen doctors were present when Jordan appeared before the staff for evaluation and diagnosis. Among other things, Dr. Estes testified, "It seems that this call to the draft board . . . served as just a sufficient trigger mechanism to turn loose this diffuse, hostile inward sort of hatred that had been latent for several years. I am saying that the draft board incident was the cause. . . . I think that certainly this irrational act of violence is consistent with a schizophrenic outburst of behavior . . ." The medical testimony further reveals that it was admitted at the staff meeting that no one could explain why Jordan passed people on the street and did not kill them while on his way to his place of employment.

Compensation for injuries under our Workmen's Compensation Act requires that the accident be one "arising out of and in the course of the employment." G.S. 97-2 (f). The words "out of" refer to the cause of the accident, while the words "in the course of" have reference to the time, place and circumstances under which it occurred. *Bell v. Dewey Bros. Inc.,* 236 N.C. 280, 72 S.E. 2d 680; *Withers v. Black,* 230 N.C. 428, 53 S.E. 2d 668; *Taylor v. Wake Forest,* 228 N.C. 346, 45 S.E. 2d 387; *Plemmons v. White's Service, Inc.,* 213 N.C. 148, 195 S.E. 370.

Certainly the injuries involved in this cause occurred "in the course of" the employees' employment. The employees at the time of the shooting were in their employer's place of business, performing the duties which their employment required.

The hearing Commissioner found in his thirteenth finding of fact, "That the incident which took place at the local draft board . . . trig-

gered the mental disturbance with which Jordan was suffering, thereby causing the acts of violence hereinafter set forth."

The appellants vigorously contend that the above finding of fact negatives completely the conclusion of law that the injuries and deaths arose "out of the employment." Therefore, they contend the awards against the defendants cannot stand. We do not concur in this view. Let us concede that the incident which took place at the draft board "triggered the mental disturbance" that ultimately culminated in the claimant's injury and the death of Parrish and Zimmerman. We do not concede that the above finding is decisive and controlling on the question raised. If Jordan, after leaving the draft board, decided to kill somebody, as he says he did, and went to his room and loaded his rifle, walked four blocks to his place of employment, not attempting to kill anyone he passed on the street, because he preferred to kill someone there at the plant whom he knew, as he said he did, and then injured the claimant and killed Parrish and Zimmerman for the reason given by him, to wit, "everybody dominates me," then there was a causal connection between the injuries and deaths and the employment. There is no evidence that Jordan had any contacts with the claimant or Parrish or Zimmerman outside the employment that might have angered him or caused him to feel that they tried to dominate him.

In the case of *Conrad v. Foundry Co.*, 198 N.C. 723, 153 S.E. 266, the claimant and another employee, named Squires, engaged in a conversation pertaining to their work, and Squires addressed to the claimant language deemed by the latter to be insulting. The claimant struck Squires with a shovel; Squires left the shop, went to the employer's office and received his wages. About half an hour later he went back to the shop, put the barrel of a shotgun through a hole in the wall and shot the claimant in the back, thereby inflicting serious and permanent injury. *Adams, J.*, speaking for the Court, said: "There must be some causal relations between the employment and the injury; but if the injury is one which, after the event, may be seen to have had its origin in the employment, it need not be shown that it is one which ought to have been foreseen or expected." The Court held the injury inflicted was an accident that arose out of and in the course of the employment. *Withers v. Black, supra; Rewis v. Insurance Co.*, 226 N.C. 325, 38 S.E. 2d 97; *Hegler v. Mills Co.*, 224 N.C. 669, 31 S.E. 2d 918; *Ashley v. Chevrolet Co.*, 222 N.C. 25, 21 S.E. 2d 834; *Wilson v. Boyd & Goforth, Inc.*, 207 N.C. 344, 177 S.E. 178.

In *Hegler v. Mills Co., supra,* Ernest Hegler and Grady Smith were employed as scrubbers in the Cannon Mills. They worked together for about a year. Then Hegler, who was the foreman of the scrubber crew, was given other work and transferred to the supply room. Smith succeeded him as foreman of the scrubber crew. Friction developed be-

tween the two—it continued for nearly a year—because Hegler sought to direct Smith's work. Hegler complained of the manner in which the scrubbing was done and finally reported the matter to the officials of the company. This report angered Smith and he threatened to get even with Hegler. Two days later, Smith was in the department where Hegler worked. He assaulted him and Hegler died from the injuries. *Stacy, C. J.,* speaking for the Court, said: "It is true, the assailant had been heard to say that he was going to kick the deceased all over the cloth room before leaving, but this was because of resentment over the impeachment of his work. Undoubtedly the friction between the two employees, which continued with intermittent bickerings for nearly a year, had its origin in the employment. While the assault may have resulted from anger or revenge, still it was rooted in and grew out of the employment." *Chambers v. Oil Co.,* 199 N.C. 28, 153 S.E. 594; *Pekin Cooperage Co. v. Industrial Com.,* 285 Ill. 31, 120 N.E. 530.

Likewise, in the case of *Wilson v. Boyd & Goforth, Inc., supra,* the claimant was at work for the defendant on a job assigned to him. One Gilbert, also an employee of the defendant in another department, who was intoxicated, interfered with the work of the claimant and assaulted him. The claimant undertook to get away from Gilbert and in doing so, fell and broke his leg. The award in favor of the claimant was upheld. It would seem clear that the intoxication of Gilbert was what caused him to interfere with the work of the claimant, but that did not insulate or prevent the accident resulting from his conduct while intoxicated from being an accident arising out of and in the course of the claimant's employment. Neither do we think, upon a careful consideration of the record in the instant case, that the incident at the draft board insulated or prevented Jordan's subsequent acts from constituting an accident arising out of and in the course of the employment of the claimant and Parrish and Zimmerman.

We hold that the findings of the hearing Commissioner, adopted by the full Commission, are supported by competent evidence. Therefore, the judgment of the Superior Court is

Affirmed.

JOHNSON, J., not sitting.