HENRIETTA HOWARD, BY HER GUARDIAN *AD LITEM*, RALPH O. HOWARD, PETITIONER-RESPONDENT, v. HARWOOD'S RESTAURANT CO., A NEW JERSEY CORPORATION, RESPONDENT-APPELLANT.

Argued September 4 and 9, 1957—Decided October 7, 1957.

*Mr. Marshall Crowley* argued the cause for the respondent-appellant (*Messrs. Toner, Crowley, Woelper & Vanderbilt,* attorneys; *Mr. Herman D. Michels,* on the brief).

*Mr. Louis C. Jacobson* argued the cause for the petitioner-respondent.

The opinion of the court was delivered by

BURLING, J. This is a workmen's compensation case. Petitioner, Henrietta Howard, filed a claim petition for compensation by her husband and guardian *ad litem*, Ralph O. Howard. She was awarded compensation and the respondent-appellant appealed the award to the Essex County Court. That court, with written opinion, 40 *N. J. Super.* 564 (*Cty. Ct.* 1956), sustained the award, and the respondent-appellant appealed the judgment to the Superior Court, Appellate Division. The Appellate Division, with a brief additional comment, sustained the judgment for the reasons stated in the opinion of Judge Gaulkin below. Respondent-appellant pursuant to a petition, successfully sought certification in this court.

For some four years prior to the incident which resulted in the instant compensation award, Mrs. Howard had performed services for the appellant Harwood's Restaurant Co., a New Jersey corporation which operates a restaurant at 44 Commerce Street, Newark, New Jersey. All the stock of Harwood's Restaurant Co., with the exception of two qualifying shares, is held by Ralph Howard, petitioner's husband, who is president of the corporation. By virtue of her one qualifying share Mrs. Howard is a director of the corporation. Since 1949 she has also served as secretary of the corporation.

Mrs. Howard came to Harwood's in 1950 after relinquishing a previous employment at another restaurant, Farm Food Management, where she had been earning $55 per week. Her usual hours of work were from 9:00 A. M. until between 5:00 and 5:30 P. M. Her husband testified that she was the "assistant manager" having charge of the office operations. In addition to operating the office she purchased supplies, took care of accounts, kept inventories, audited the activities of waiters, checked the cash register tapes, made the bank deposits, and was in full authority at those times when her husband was not on the premises.

On the morning of January 28, 1954 Mrs. Howard was savagely attacked with a monkey wrench by Lucio L.

Williamson, a porter and handyman in the employ of appellant. The attack occurred in a room on the second floor of the restaurant, some 50 feet from appellant's office where the cash receipts from the night before had been kept. There were no witnesses. Two separate hypotheses are advanced concerning the motivation for the vicious attack upon Mrs. Howard. The theory advanced by the petitioner is that Williamson had asked Mrs. Howard prior to the attack to advance him some money, which request was refused. Williamson testified at the hearing that he had on past occasions borrowed money from other employees of appellant and that he had frequently taken advances on his salary, which sums were deducted each week from his pay by Mrs. Howard. He further admitted that at the time of the attack he was indebted for a large sum of money. Members of the Newark police department who investigated the case and had inspected the premises where the attack had taken place testified that the office safe was unlocked and that there was money in the safe and money in Mrs. Howard's desk belonging to the corporation. Petitioner surmises that "Apparently Mrs. Howard, on arriving at the employer's place of business that morning, opened the safe and was preparing the deposit and the cash necessary for the various registers in respondent's place of business." The inference drawn, which was denied by Williamson, is that the motivation for the attack was robbery; that the brutal beating was a consequence of Williamson's need for money and the refusal of Mrs. Howard to advance him any.

Appellant maintains that robbery was not the motive. Although the safe in the office was found unlocked, the door was closed. Moreover, some $250 in cash receipts in the safe and $85 in a desk drawer were intact. In addition, appellant contends that the testimony of Mrs. Howard, taken from her bedside at the nursing home, that Williamson had requested a loan, should not be given much weight. Her condition was such that she was unable to state her age, what day of the month or week it was, or how long she had been married.

Appellant, relying upon Williamson's testimony at the hearing, advances the hypothesis that the attack was motivated by an insane "delusional impulse on the part of Williamson in that he thought he was punishing his common law wife for a wrong she may have done him or that he thought she had done." Whether acceptance of appellant's hypothesis would necessitate reversing the judgment will be discussed later in the opinion.

Little can be gained from recounting in detail here the nature of the injuries sustained by Mrs. Howard as a result of the brutal attack upon her person. It is sufficient to note that as a result of numerous injuries sustained by her she was rendered continuously unconscious for some 50 days, and was hospitalized for over 100 days during which time she underwent brain and plastic surgery and tracheotomy. After several periods of hospitalization and setbacks she was admitted to a nursing home where she remains today, totally and permanently disabled. She suffers from paralysis of her left arm and leg, a traumatic cataract and frequent periods of convulsion.

The expert medical opinion adduced at the hearing indicates that petitioner's prognosis as a useful citizen is hopeless and that after a time lapse of a year and a half her pathology is irreversible. The medical testimony further indicated that physiotherapy to petitioner's left arm and leg was palliative and could not restore the usefulness of the affected members. With perhaps the exception of the taking of anti-convulsive medicines under the supervision of a physician, the care and treatment at the nursing home could in no wise "cure" Mrs. Howard. They are rendered solely for the purpose of relief, i. e., of easing or alleviating her suffering.

The judgments below determined that on January 28, 1954 Mrs. Howard was an employee of the appellant at a wage of $50 per week, plus meals, and that on that date she suffered injury by accident arising out of and in the course of her employment. She was awarded temporary disability from January 28, 1954 to September 21, 1954, at the rate of $30

per week, amounting to $1,015.71. From September 21, 1954 she was awarded total and permanent disability payments for a period of 450 weeks, amounting to $13,500, and at the expiration of such period such further benefits that she is entitled to receive by virtue of *R. S.* 34:15–12(*b*). Appellant was ordered to pay $11,254.50 for hospital, medical and nursing services and maintenance at a nursing home up to July 25, 1955, and was further ordered to defray in the future any costs for such medical services, nursing services, drugs and the maintenance of the petitioner "as may be required."

## I.

Appellant's initial attack is upon the findings below that petitioner was an employee of Harwood's Restaurant Co., within the meaning of *R. S.* 34:15–36. *In limine,* it should be noted that Mrs. Howard is not disabled from processing her claim because she is a director and officer of the corporation. It is now the settled law of this jurisdiction that corporate officers are not precluded from workmen's compensation benefits and that when they "perform work which if performed by anyone else would confer employee status for the purposes of the Workmen's Compensation Act the officers have that status." *Mahoney v. Nitroform Company,* 20 *N. J.* 499, 504 (1956). The sole question presented on the present issue is whether the services rendered by petitioner were performed "for financial consideration," as required by *R. S.* 34:15–36. This court is asked to invoke its discretionary authority under *R. R.* 1:5–4(*b*) to make new or amended findings of fact for the reason that petitioner did not sustain the burden of proving that she performed services for remuneration. See *Temple v. Storch Trucking Co.,* 3 *N. J.* 42, 48 (1949). Examination of the record for that limited purpose indicates the contrary.

Petitioner's husband testified that from the time that petitioner came to work for Harwood's there was an "understanding" between them that she was to receive a salary

of $50 per week, which monies were to be paid "if and when the Company can afford to pay her." Although there were years in which the corporation made a profit, there is no evidence that the salary was ever paid. Moreover, the books of the corporation for the period in question do not contain any reference to the arrangement, nor do the records disclose that any payroll deductions for withholding tax or social security were made. Were this the only evidence of the arrangement, considering the self-serving nature of declarations of Mr. Howard, a serious question of credibility would be raised and this court might well be impelled to reverse the findings of fact below. See *Pratico v. Rhodes,* 17 *N. J.* 328, 335 (1955).

Mr. Howard further testified that late in the year 1953 an additional agreement was entered into between himself acting for the corporation and his wife. The motivating factor for the new agreement was an expressed concern over petitioner's social security status. It was decided that the salary obligation to petitioner of $50 per week from 1950 until the last quarter of 1953 should be "washed away" since the corporation was not "in good enough shape" to pay thousands of dollars in accumulated salary. In lieu thereof, it was agreed that petitioner was to receive a salary of $50 per week payable every month and that the salary which had accumulated for the last quarter of 1953 was to be paid. At the hearing, some nine months after the attack, Mr. Howard produced a typewritten demand note dated January 7, 1954 for $650. and signed by Howard as president of the corporation. He testified that the note represented payment of salary for the last quarter of 1953, a period of 13 weeks at $50 per week. The note was contained in an envelope which bore the notation "note for salary due H. Howard, last quarter 1953." The notation is apparently in petitioner's handwriting. It is significant that appellant submitted the handwriting on the note to a handwriting expert for comparison with other known examples of Mrs. Howard's handwriting and that the expert was not produced as a witness. Of even greater evidential value is

the undisputed testimony of the medical experts that in light of Mrs. Howard's physical condition it was impossible for her to have written the notation at any time after the attack.

Appellant contends that the note could have been made after the attack and placed in the envelope, but we find that the notation on the envelope lends credence to its contents. We concur with the finding of Judge Gaulkin below that the envelope and the note are "mute but most persuasive evidence that the arrangement for $50.00 a week had indeed been entered into."

That circumstance far outweighs any unfavorable inference which may be drawn from the failure to produce the note prior to the hearing for the inspection of insurance agents investigating the claim.

## II.

The next contention of the appellant is that petitioner's injuries did not arise out of her employment. We are asked to accept the hypothesis that the attack was motivated by an insane delusion, rather than an intent to rob. The deputy director and the County Court refused to make a choice and held the claim may be supported as arising out of the employment under either theory. *Link v. Eastern Aircraft,* 136 *N. J. L.* 540 (*E. & A.* 1948). We find their legal conclusion correct, thus negating the necessity for choice. It is now well settled in this jurisdiction that where an employee sustains injuries as a result of an attack pursuant to an attempt to rob the employer the injury arises out of the employment. *Cole v. I. Lewis Cigar Mfg. Co.,* 3 *N. J.* 9 (1949).

The question raised by appellant's hypothesis of the motivation for the attack, *i. e.,* whether an attack by an insane co-employee may be said to arise out of the employment, is one of first impression in this jurisdiction. Appellant asserts that to hold that the present injury arose out of the employment necessitates adoption by this court of the positional or "but for" doctrine. They further claim that the County Court erred in its determination that the

positional or "but for" doctrine "appears in large part to have been adopted in New Jersey," and were that the test for determining arising out of, compensation would have been granted rather than denied in *Henderson v. Celanese Corp.*, 16 *N. J.* 208 (1954), and *Bowen v. Olesky,* 20 *N. J.* 520 (1956).

Our decisions leave little doubt that the positional or "but for" test has been adopted in this jurisdiction. *Sanders v. Jarka Corporation,* 1 *N. J.* 36 (1948), involved a compensation claim growing out of an altercation between two truck drivers following a traffic accident. In upholding the compensation award this court said:

" 'The employment * * * was the cause [of the accident] in the sense that, but for the employment, the accident would not have happened. * * *'
An analysis of the facts demonstrates quite convincingly that without the collision of the trucks there would not have been an inquiry for the license number, and but for the inquiry there would not have been an exchange of words, and without the exchange of words there would not have been an assault." (1 *N. J.* at *page* 41)

The doctrine was again applied in *Gargiulo v. Gargiulo,* 13 *N. J.* 8 (1953). There the employee was a store clerk who had gone to the rear of his employer's premises to burn some trash. As he completed the task and was walking to the rear entrance of the store he was struck in the eye by an arrow shot by a boy in the direction of the employer's property. On the sole question of whether the injury arose out of the employment, we held:

"It [employment] was a necessary antecedent in that the injured employee would not have been where he was had he not been engaged in his appointed task. It brought him unwittingly into the line of fire of the arrow, where he would not have been except for his employment. But for the compliance with his allotted work directive requiring his presence at the particular time and place in question, the injury would not have been inflicted." (13 *N. J.* at *page* 13)

See also *"Larson, Legal Aspects of Causation in Workmen's Compensation,"* 8 *Rutgers L. Rev.* 423, 427.

The "but for" or positional test for determining causation in workmen's compensation cases does not, as contended, make the employer a guarantor of every evil which may befall a workman within the physical time and space of his employment. We would not adopt a causation in fact test which says with Benjamin Franklin that "For want of a nail * * * a kingdom is lost." First, there is an inherent limitation in the phraseology of the test. "But for" connotes a standard of reasonable probability. Thus stated, the question is whether it is more probably true than not that the injury would have occurred during the time and place of employment rather than elsewhere. This explains the result in *Henderson v. Celanese Corp.*, *supra*, which appellant contends is inconsistent with the positional doctrine. That case involved an ideopathic fall. The employee during an epileptic seizure fell and struck his head against the concrete floor of the employer's factory, causing injury. The denial of compensation in that case was premised upon a consideration that it was just as probable for the same injury to have occurred outside of the employment. The court expressly stated that "the same consequences would probably have been forthcoming had the appellant suffered his seizure on the street or in his home." The express ground for decision in *Henderson* is further illuminated when that case is compared with *Reynolds v. Passaic Valley Sewerage Com'rs.*, 130 *N. J. L.* 437 (*Sup. Ct.* 1943), affirmed 131 *N. J. L.* 327 (*E. & A.* 1944), where an employee suffered an epileptic seizure and fell against a hot stove in a little shanty in which the employee had sought relief. In that case compensation for the resultant injury was awarded. The distinction between *Henderson* and *Reynolds* lies in the fact that in the latter case it could properly be said that it was more probably true than not that the injury would not have occurred under the normal circumstances of every day life which exist outside of the employment, while in the former it could not. See *Rodes, "Workmen's Compensation,"* 10 *Rutgers L. Rev.* 140, 142–144.

There is yet another recognized limitation on the positional or "but for" doctrine as a causative test in workmen's compensation. That relates to the nature of the risk which causes injury to the employee. The more obvious kinds of risks are those distinctly associated with the employment. As stated by Dean Larson, in his work on *Workmen's Compensation Law, vol.* I, § 7.10, *p.* 48:

> "This group comprises all the obvious kinds of injury one thinks of at once as 'industrial injury.' All the things that can go wrong around a modern factory, mill, mine, transportation system or construction project—machinery breaking, objects falling, explosives exploding, tractors tipping, fingers getting caught in gears, excavations caving in and so on—are clearly in this category and constitute the bulk of what not only the public but perhaps also the original draftsmen of compensation acts had in mind as their proper concern."

These risks are clearly compensable when they occur at the place of and during the hours of employment.

*Sanders v. Jarka Corp., supra,* may be said to fall within this category, because the attack there ensued from the employee's performance of his employment duties.

A second category of risks causing injury which may be said to arise out of the employment are those which have been described as "neutral." Larson, *supra, vol.* I, § 7.30, *p.* 49. Neutral risks may be defined as uncontrollable circumstances which do not originate in the employment environment but which happen to befall the employee during the course of his employment. A common example of this type of risk is acts of God, such as lightning. The injury resulting from the fallen arrow in *Gargiulo v. Gargiulo, supra,* is another example of a neutral risk.

There is, however, a third category of risks which do not bear a sufficient causative relation to the employment and which, therefore, may not be said to arise out of the employment. These risks have been denominated as those personal to the claimant. *Larson, supra, vol.* I, § 7.20, *p.* 49. Thus, where an employee is attacked during his employment by a person whose motive is that of vengeance stemming from personal contact with the employee, the injury cannot be

said to arise out of the employment. *Giles v. W. E. Beverage Co.,* 133 *N. J. L.* 137 *(Sup. Ct.* 1945), affirmed 134 *N. J. L.* 234 (1946); *Bowen v. Olesky, supra.* In these situations, the employment connection with the injury is minimal; it is the personal proclivities or contacts of the employee which gives rise to the harm, so that even though the injury takes place during the employment compensation is denied.

The above considerations are dispositive of appellant's assertion that *Bowen v. Olesky, supra,* is inconsistent with the positional or "but for" doctrine. A reading of that case indicates that compensation was denied because the preponderance of the evidence was strongly suggestive of the fact that the attack was motivated by a desire of personal vengeance rather than an intent to rob the employer. The holding was premised upon the simple fact that the claimant had not met his burden of proof.

■ We come next to an application of the foregoing principles to the facts of the instant case. The analysis in each case is a two-step process. We must first ascertain whether but for the fact of employment the injury would not have happened. On this point there can be no serious argument. No one can rationally contend that had Mrs. Howard not been at work on the morning of January 28, 1954 she still would have been attacked by Williamson. Thus establishing the positional relation of the employment to the injury we must next determine the nature of the risk involved. Some courts have adopted the view that an attack by an insane employee is one distinctly associated with the employment. This is the view of the Connecticut Supreme Court of Errors, expounded in *Anderson v. Security Building Co.,* 100 *Conn.* 373, 123 *A.* 843, 40 *A. L. R.* 1119 (1924), quoted from by *Larson, supra,* § 11.32(*a*), *p.* 147, wherein the court states:

"When an employer puts an employee at work on a machine, although the employer may have exercised all reasonable care to provide that it is safe, * * * which, without fault on his part, has a latent defect, which causes it to break down and injure the employee, the injury is unquestionably one arising out of a condition of his employment. It is immaterial, under the act,

whether the employer knew or ought to have known of the existence of the dangerous condition * * *. So in this case, although the employer may not have had knowledge actual or constructive that Markus, a fellow servant of the plaintiff, was insane and liable to run amuck, yet such liability of Markus to run amuck was in fact a condition under which the plaintiff was employed on the night in question, and, if such condition of Markus caused an injury to the plaintiff, as it did, then the injury to the plaintiff arose out of his employment as truly as it had arisen from the negligence of Markus in doing his work."

Appellant, however, urges that irrational impulses of workmen over which the employer has no control cannot be said to be a risk connected with the employment. But that argument will avail little, because even if the risk is not one directly related to the employment, it may at least be classified as neutral. We cannot with any rational degree of consistency say that an arrow shot by a boy onto the employer's premises is causally related to the employment, while an assault and battery committed upon an employee by an insane co-employee is not. The employer's lack of control over the source of the harm is obvious in either situation, and at least in the instant case it may be said that the employer placed Williamson in a position to do harm.

We interpret the law of this State to be that an attack upon the person of an employee by a co-employee motivated by a delusional impulse is one which arises out of the employment within the meaning of the Workmen's Compensation Act, *R. S.* 34:15–7 *et seq.* We are further fortified by the fact that the great weight of authority throughout the country supports this position. *Larson, supra, vol.* I, § 11.32(a), *p.* 146; *Pacific Employer's Ins. Co. v. Industrial Accident Comm.,* 139 *Cal. App. 2d* 260, 293 *P. 2d* 502, 503 (*App. Ct.* 1956); *Zimmerman v. Elizabeth City Freezer Locker,* 244 *N. C.* 628, 94 *S. E. 2d* 813 (*Sup. Ct.* 1953); *Chadwick v. White Provision Co.,* 82 *Ga. App.* 249, 60 *S. E. 2d* 551 (*App. Ct.* 1950); *John H. Kaiser Lumber Co. v. Industrial Commission,* 181 *Wis.* 513, 195 *N. W.* 329 (*Sup. Ct.* 1923); *Anderson v. Security Building Co., supra; Whaley v. Patent Button Co.,* 184

*Tenn.* 700, 202 *S. W. 2d* 649 (*Sup. Ct.* 1947); *Petroleum Casualty Co. v. Kinkaid,* 93 *S. W. 2d* 499 (*Tex. Civ. App.* 1936); *Charbazian v. Regina Novelty Corp.,* 257 *App. Div.* 1097, 14 *N. Y. S. 2d* 654 (*App. Div.* 1937); *contra: Jones Foundry & Machine Co. v. Industrial Commission,* 312 *Ill.* 27, 143 *N. E.* 420 (*Sup. Ct.* 1924); *Spring Canyon Coal Co. v. Industrial Commission,* 58 *Utah* 608, 201 *P.* 173 (*Sup. Ct.* 1921).

## III.

Appellant's last contention is that under *R. S.* 34:15–15 it is under no duty to provide treatment and services which simply relieve, but cannot cure the petitioner of her injuries.

The pertinent portions of *R. S.* 34:15–15 provide:

"The employer shall furnish to the injured workman such medical, surgical and other treatment, and hospital service as shall be necessary to cure and relieve the workman of the effects of the injury and to restore the functions of the injured member or organ where such restoration is possible; provided, however, that the employer shall not be liable to furnish or pay for physicians' or surgeons' services in excess of fifty dollars and in addition to furnish hospital service in excess of fifty dollars, unless the injured workman or the physician who treats him, or any other person on his behalf, shall file a petition with the workmen's compensation bureau stating the need for physicians' or surgeons' services in excess of fifty dollars, as aforesaid, and such hospital service or appliances in excess of fifty dollars, as aforesaid, and the workmen's compensation bureau after investigating the need of the same and giving the employer an opportunity to be heard, shall determine that such physicians' and surgeons' treatment and hospital services are or were necessary, and that the fees for the same are reasonable and shall make an order requiring the employer to pay for or furnish the same.

\* \* \* \* \* \* \*

When an injured employee may be partially or wholly relieved of the effects of a permanent injury, by use of an artificial limb or other appliances, which phrase shall also include artificial teeth or glass eye, the workmen's compensation bureau, acting under competent medical advice, is empowered to determine the character and nature of such limb or appliance, and to require the employer or his insurance carrier to furnish the same"

It is argued that the word "and" in "cure and relieve" is used in the conjunctive sense, and therefore "cure" operates as a precondition to relieve.

■ It should first be noted that in any problem relating to the construction of the Workmen's Compensation Act we have frequently admonished that the act is to be liberally construed "to alleviate consequences of personal injuries caused by employment and to effect a measure of economic security for the workman so injured and to place the burden thereof upon industry." *Gargiulo v. Gargiulo, supra,* 13 *N. J.* at *page* 13. In light of these stated purposes of the act, the construction urged by the appellant appears anomalous. The effect given the statute by appellant's construction is that in those cases where the injury arising out of the employment is most serious, *i. e.,* where the workman is totally and permanently disabled and without hope of cure, the employer's duty to render medical care and treatment ceases.

Thus, in a situation where the injury results in an incurable cancerous condition the employer is not obligated to defray the cost of medical treatment which might ease or mitigate the pain and suffering of the employee, and the employee is left to his own economic resources in acquiring such care as he may be able to afford.

We will not, in the absence of a clear legislative intent to the contrary, condone an interpretation of the act so discordant with its benevolent purposes.

■ The words "or" and "and" are ofttimes used interchangeably, and the determination of whether the word "and" as used in a statute should be read in the conjunctive or disjunctive depends primarily upon the legislative intent. *Sutherland, Statutory Construction* (*3d ed.* 1943), § 4923; *Murphy v. Zink,* 136 *N. J. L.* 235, 239 (*Sup. Ct.* 1947), affirmed 136 *N. J. L.* 635 (*E. & A.* 1948).

Appellant contends that an examination of the legislative history of *R. S.* 34:15–15 and judicial opinions construing its predecessor sections indicates a legislative intention that palliative treatment alone, without the possibility of cure, is not compensable under the act. We find the legislative intent to be clearly otherwise.

*R. S.* 34:15–15 was first enacted into New Jersey law by *Laws* 1911, *chapter* 95, *section* 14 which provided:

"During the first two weeks after the injury the employer shall furnish reasonable medical and hospital services and medicines, as and when needed, not to exceed one hundred dollars in value, unless the employe refuses to allow them to be furnished by the employer."

A 1913 amendment to the act is not pertinent to our inquiry here, but in 1919 the section was again amended by *Laws* 1919, *chapter* 93, *section* 4. That amendment provided:

"Paragraph fourteen of the said act is hereby amended to read as follows:

14. On the day of the accident, and during the next following twenty-seven consecutive days, the employer shall furnish reasonable medical and hospital services and medicines as and when needed not to exceed fifty dollars in value, unless the employee refuses to allow them to be furnished by the employer; *provided, however,* that in severe cases requiring unusual medical or surgical treatment or calling for artificial limb or other mechanical appliances, the employee or his representative shall be authorized to present a petition to the Workmen's Compensation Bureau, and the Commissioner, deputy commissioner or referee thereof is hereby empowered, when warranted by the evidence produced, to order additional services, artificial limbs or other appliances not to exceed in total the sum of two hundred dollars, or to extend over a period not to exceed in total seventeen weeks. This paragraph shall apply only to non-fatal cases."

Thus, by this amendment the obligation of the employer to furnish reasonable medical and hospital services was increased from two to four weeks. In addition, the further proviso was added that in "severe cases requiring unusual medical or surgical treatment or calling for artificial limb or other mechanical appliances" authority was granted to the Workmen's Compensation Bureau to order such additional treatment or appliances not in excess of $200.

 It is relevant to the present inquiry to consider whether the meaning of the phrase "unusual medical or surgical treatment" includes treatment which relieves, but does not cure, the effects of the injury. We are aided in this inquiry by the familiar canon of statutory construction,

*nonscitur a sociis,* a word or phrase is known by the company it keeps. See *Sutherland, supra,* § 4908. Juxtaposed to the phrase in question is the language, "or calling for artificial limb or other mechanical appliances." It is obvious that an artificial limb or other mechanical device cannot cure an injury—it merely relieves from the effects of it. The phrase "unusual medical or surgical treatment" must take meaning from the words which immediately follow in context. We therefore find that the intendment of the 1919 amendment was to supply medical and surgical treatment to injured employees which did not of necessity result in cure, but which might afford some measure of relief from the effects of such injury.

The words "cure and relieve" first appear in the act by amendment of 1922, *Laws* 1922, *chapter 245, section* 1. It will be noted that with the exception of the last paragraph of *R. S.* 34:15–15 relating to artificial limbs, the 1922 amendment is virtually identical to the present version. The last paragraph of *R. S.* 34:15–15 was added in 1928 and the reasons therefor will be alluded to later under this point. The amendment of 1922 provided:

"The employer shall furnish to the injured workman such medical, surgical and other treatment, and hospital service as shall be necessary to cure and relieve the workman of the effects of the injury and to restore the functions of the injured member or organ where such restoration is possible; *provided, however,* that the employer shall not be liable to furnish or pay for physicians' or surgeons' services in excess of fifty dollars and in addition to furnish hospital services when necessary in excess of fifty dollars, unless the injured workman or the physician who treats him, or any other person on his behalf, shall file a petition with the Workmen's Compensation Bureau stating the need for such physician's or surgeon's services in excess of fifty dollars, as aforesaid, and such hospital service or appliances in excess of fifty dollars as aforesaid, and the Workmen's Compensation Bureau after investigating the need of the same and giving the employer an opportunity to be heard, shall determine that such physician's and surgeon's treatment and hospital services are or were necessary, and that the fees for the same are reasonable and shall make an order requiring the employer to pay for or furnish the same."

The 1922 amendment was a further liberalization of the section. The $200 limitation in the proviso section was removed and the Workmen's Compensation Bureau was authorized to allow such medical treatment or services as it found to be "necessary." Of great significance to the present inquiry is the fact that the words "unusual medical or surgical treatment" were omitted and in lieu thereof the words "medical, surgical and other treatment, and hospital service as shall be necessary to cure and relieve the workman of the effects of the injury" appear. We find that the purpose of deleting the adjective "unusual" and substituting in its stead the language "cure and relieve" was to make explicit what had under the 1919 act only been implied, i. e., that a workman was entitled to benefits for medical services, hospital services, or treatment which would afford relief from the sufferings incident to an accident arising out of his employment, whether or not a cure might at the same time be effectuated.

That such was the legislative intent in changing the language of the section is apparent from a reading of the statement of purpose appended to *Senate Bill No. 208* of 1922 which finally became *chapter 245* which states:

"The purpose of this bill is to amend the provisions of the Workmen's Compensation Act so as to separate the charges for physicians' and surgeons' fees from charges for hospital services, apparatus and appliances furnished to the injured employee, and to authorize the Workmen's Compensation Bureau to require the employer to furnish necessary *treatment* and *appliances* to an injured employee." (Emphasis supplied.)

Appellant contends, however, that the case of *Peczar v. Ryan Leather Co., 5 N. J. Misc.* 117 (*Sup. Ct.* 1927), is dispositive of the question of the meaning of the 1922 act. In that case following a compensation award for the loss of a hand the injured employee made application for an order requiring his employer to furnish him with an artificial hand. The order was granted by the Bureau and confirmed by the Common Pleas Court, but the former Supreme Court reversed the award. In a brief opinion, the court held that:

"In view of the fact that the act of 1919, *supra*, specifically provides for artificial limbs, and its amendment of 1922, *supra*, omits such specific language, leads us to the conclusion that the legislative intent and purpose was to eliminate any and all provision for them in the later enactment." (5 *N. J. Misc.* at *page* 118)

Appellant urges that since an artificial limb may be said to relieve an injury, but cannot be said to "cure" it by the denial of such an appliance, the court in *Peczar* "must have concluded, as contended here, that the employer's obligation to furnish treatment and services was limited to those instances where such treatment and service would not only relieve the workman but cure him of the effects of his injury as well."

In light of the previous discussion of the history and purpose of the 1922 act, we feel that the court in *Peczar, supra,* was in error on the precise issue before it. It does not appear from the reported case that the statement of purpose appended to the Senate Bill in the 1922 amendment was before the court in that case. If it were, a contrary result might have been reached. But even assuming that decision to be correct, it would not justify reversal in the instant case. It is clear from the quoted language that that case was decided on the narrow issue of the omission of the specific language relating to artificial limbs from the 1922 act, when such language was included in the 1919 act. The meaning of the phrase, "such medical, surgical and other treatment, and hospital service as shall be necessary to cure and relieve," was not in issue thereto. Even assuming that the Legislature in 1922 intended to deny workmen the benefits of their right to appliances under the 1919 act, it would not necessarily follow that their right to medical services and treatment which may relieve, but not cure, the effects of injury was also intended to be taken away.

It is of interest to note that in the next session of the Legislature the *Peczar* decision was nullified by the amendment which added the last sentence of the present 34:15–15 requiring the employer to furnish artificial limbs. *Laws*

1928, *c.* 149, § 1. The statement of purpose of that bill reads as follows:

"The purpose of this act is to make *plain* that an employer must furnish an employee who has been permanently injured with an artificial limb or such other appliances as shall be needful to relieve him as far as possible of the effects of the injury." (Emphasis supplied.)

There was here no long standing legislative acquiescence of the judicial construction.

Appellant also argues that the present act was construed in *Coates v. Warren Hotel,* 18 *N. J. Misc.* 122 (*Dept. Labor* 1940), modified on other grounds, 18 *N. J. Misc.* 363 (*C. P.* 1940), as not requiring an employer to pay for services that would afford relief only. In that case the petitioner sought recovery for the expense in engaging for a period of 71 days a practical nurse to care for petitioner and to do housework. She also attempted to recover for the services of her husband who performed like duties. The claim was denied.

 Nursing care properly comes within the phrase "hospital service." *Travelers Ins. Co. v. Dickson,* 66 *F. Supp.* 72 (*D. C. S. D. Tex.* 1946), affirmed 160 *F. 2d* 167 (5 *Cir.* 1947); *Toland v. Murphy Bros.,* 172 *Pa. Super.* 484, 94 *A. 2d* 156 (*Sup. Ct.* 1953). But our legislative proscription is that it must be "necessary to cure and relieve * * * of the effects of injury." The services must be shown by competent medical testimony to be such as are reasonable and necessary for the particular patient, taking into consideration his individual condition and need. See *Travelers Ins. Co. v. Dickson, supra.* In *Coates* it does not appear that the care of a practical nurse for the claimant was prescribed by a physician as necessary to relieve from the effects of her injuries. Moreover, the services performed by the practical nurse were, at least in part, household chores that claimant could not herself perform. Such services are not medical in nature and cannot be said to be necessary for the cure or relief of the claimant.

 The medical testimony in the instant case including that of appellant's own witness, indicates that Mrs. Howard

is a nursing problem. She requires constant nursing care in addition to receiving palliative physiotherapy treatment. The record amply supports the conclusion that taking into consideration Mrs. Howard's condition and needs, the care and treatment she is receiving at the nursing home are such as are "necessary to cure and relieve" her of the effects of her injury within the intendment of *R. S.* 34:15–15.

We might add that in addition to the legislative history of our act, we have, aided by the industry of counsel, engaged in a diligent search for authorities from other jurisdictions relative to the present issue and find these authorities support the conclusion reached here. The following jurisdictions have adopted the view that medical services which afford relief alone are allowable under their applicable statutory provisions: California, *United States Fidelity & Guaranty Co. v. Department of Industrial Relations,* 207 *Cal.* 144, 277 *P.* 492 (*Sup. Ct.* 1929) (cure and relieve) ; Minnesota, *Eberle v. Miller,* 170 *Minn.* 207, 212 *N. W.* 190 (*Sup. Ct.* 1927) ; Illinois, *W. J. Newman Co. v. Industrial Commission,* 353 *Ill.* 190, 187 *N. E.* 137, 88 *A. L. R.* 1188 (*Sup. Ct.* 1933) (cure or relieve) ; Massachusetts, *Meuse's Case,* 262 *Mass.* 95, 159 *N. E.* 636 (*Sup. Jud. Ct.* 1928) (unusual cases, but recovery limited to statutory period for general incapacity of 34 weeks in *Meuse's Case,* 270 *Mass.* 29, 169 *N. E.* 517 (*Sup. Jud. Ct.* 1930)) ; Missouri, *Brollier v. Van Alstine,* 236 *Mo. App.* 1233, 163 *S. W.* 2d 109 (*Ct. App.* 1942) ; Florida, *Di Giorgio Fruit Corp. v. Pittman,* 49 *So.* 2d 600 (*Fla. Sup. Ct.* 1950) (as may be necessary to effect a recovery). Those jurisdictions *contra* are : Rhode Island, *LeClair v. Textron Mills, Inc.,* 77 *R. I.* 318, 75 *A.* 2d 309 (*Sup. Ct.* 1950) (cure or rehabilitation) ; Nebraska, *Wilson v. Brown-McDonald Co.,* 134 *Neb.* 211, 278 *N. W.* 254, 116 *A. L. R.* 702 (*Sup. Ct.* 1938) (reasonable medical and hospital services) ; North Carolina, *Millwood v. Firestone Cotton Mills,* 215 *N. C.* 519, 2 *S. E.* 2d 560 (*Sup. Ct.* 1939) (tend to lessen the period of disability).

It is worthy of note that there is no square holding in the *contra* category premised upon a statute which uses the

word "relieve," while in many of the holdings which are in accord with the result here, the word "relieve" either in the conjunctive or disjunctive is used.

The judgment is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING and JACOBS—6.

*For reversal*—None.