NEW JERSEY DEPARTMENT OF LABOR,
WORKMEN'S COMPENSATION BUREAU.

PAULINE C. RAFFERTY, PETITIONER, v. DAIRYMEN'S LEAGUE CO-OPERATIVE ASSOCIATION, INCORPORATED, RESPONDENT.

Decided June 11, 1938.

For the petitioner, *Maurice J. Cronin* (*George R. Milstein, Benjamin Dowden* and *Edwin J. O'Brien,* of counsel).

For the respondent, *Clarence B. Tippett.*

\*        \*        \*        \*        \*        \*        \*

The undisputed facts as developed in the evidence are essentially as follows: On December 2d, 1936, and for more than nine years prior thereto, William Francis Rafferty, petitioner's decedent, was employed by the respondent in the capacity of sales supervisor in the metropolitan area. While his duties were primarily confined to selling the respondent's products and obtaining new accounts, with full charge over the several salesmen in the metropolitan district, he was frequently called upon to perform special duties such as to entertain customers at the respondent's expense and to attend various banquets at which the trade was represented. These special assignments were in addition to his regular work and invariably required the decedent's presence during the evenings—some of these functions lasting until the early hours of the morning. He received for his said services a salary of $250 per month, together with the use of an automobile

furnished and maintained by the respondent. It so happened that the decedent was called upon to attend a dinner of the New York Restauranteurs' Association on November 30th, 1936, which was held at Kean's Chop House in New York City. This affair broke up early enabling him to arrive at his home in Maplewood before midnight. On December 1st, 1936, after finishing his regular day's work, he was instructed by a Mr. Robert M. Mason, his immediate superior, to attend a banquet of the New York and New Jersey Milk Institute which was being held that evening at the Pennsylvania Hotel. Leaving the respondent's office at No. 11 East Forty-second street, New York City, in the company of Edward C. Polley, a fellow-salesman, decedent drove to the hotel in his company-assigned car, arriving at the banquet hall a few minutes after seven o'clock. He was joined there by several other members of the respondent's sales staff, including Mr. Mason. At eleven-thirty P. M., after the banquet was over, decedent journeyed to Hotel New Yorker, where a group of respondent's customers was being entertained by Mr. Polley. A private suite of rooms had been engaged for the affair, and cocktails and hors d'oeuvres were served to the guests—the expenses of which were borne by the respondent. The festivities came to an end sometime between three and four o'clock in the morning at which time most of the guests, including the decedent, left the hotel presumably for their respective homes. The weather at that hour was stormy and a light snow had covered the ground. Several hours later, Charles Miller, night watchman of the Western Union Telegraph Company, in making his usual rounds, noticed decedent's car draw up to the curb and stop in front of his employer's premises, situated at the foot of Hudson street, Jersey City, adjacent to the Morris canal basin. Hudson street begins at Exchange Place, one block east of the Pennsylvania Railroad ferry-house, runs parallel with the Hudson river, and ends at the Morris canal basin—there being no fence or barrier at the foot of said street to serve as a protection to the motorist and traveling public from the waters thereof. At approximately seven-thirty A. M., several of the Western Union employes

began to arrive for work and because decedent's car was partly obstructing the driveway leading from the street to the Western Union cable house they proceeded to push the car a few feet ahead in order to clear the driveway. Peering inside the car they observed the decedent apparently asleep and upon arousing him from his slumber they found him to be all right except that he appeared tired and in want of sleep. A short time later their attention was attracted when the car started in motion in a forward direction and plunged into the icy waters of the Morris canal basin less than seventy-five feet away from where it had been parked. Their frantic efforts to rescue the decedent proved of no avail for although the car was retrieved within ten or fifteen minutes by means of grappling hooks and a winch, equipment of the Western Union Telegraph Company, death had already taken its toll. It is by reason of Rafferty's death that the petitioner, Pauline C. Rafferty, his lawful widow and the mother of his two infant children, Diane Marie Rafferty, a daughter born February 26th, 1928, and William Francis Rafferty, a son born September 22d, 1932, brings this proceeding to recover compensation from the respondent on the ground that his death occurred as a result of an accident, arising out of and in the course of his employment.

The burden of proof rests upon the petitioner to establish her right to compensation. The rule applicable to the case under consideration is ably stated by Mr. Justice Trenchard in *Bryant* v. *Fissell*, 84 *N. J. L.* 72; 86 *Atl. Rep.* 458, "that the burden of furnishing evidence from which the legitimate inference can be drawn that the death of an employe was caused by an accident arising out of and in the course of employment rests upon the claimant."

While there is no question but that the decedent met his death by accidental drowning on the morning of December 2d, 1936, when his car plunged into the Morris canal basin, the respondent controverts petitioner's right of recovery upon the ground that his death was not the result of a compensable accident within the meaning and purview of the Workmen's Compensation act.

The sole issue raised, therefore, is whether or not Rafferty's death resulted from an accident arising out of and in the course of his employment with the respondent.

Upon carefully considering the evidence in the case and upon making an exhaustive research of the authorities, I feel reasonably satisfied that the accident which occasioned the death of Rafferty by drowning arose both out of as well as in the course of his employment. The words "out of" relate to the origin or cause of the accident; the words "in the course of," to the time, place and circumstances under which the accident takes place. The former words relate to the character of the accident, while the latter words relate to the circumstances under which the accident takes place. An accident comes within the latter words if it occurs while the employe is doing what a man so employed may reasonably do within a time during which he is employed and at a place where he may reasonably be during the time to do that thing. The accident, in order to arise "out of" the employment, must be of such nature the risk of which might have been contemplated by a reasonable person when entering the employment, as incidental to it. A risk is incidental to the employment when it belongs to or is connected with what a workman has to do in fulfilling his contract of service.

As a general rule an accident occurring to an employe away from the employer's premises while going to or returning from work does not arise out of and in the course of the employment. There are, however, exceptions to this rule which, for the sake of convenience, I shall classify under four groups or headings, as follows:

(1) *Where Transportation is Furnished by the Employer to and from the Place of Employment.* An injury sustained by an employe while riding to or from the place of employment in a conveyance furnished by the employer in compliance with the terms of the contract of hire or upon the ground of mutual benefit arises out of and in the course of the employment. *Rubeo* v. *McMullen Co.,* 117 *N. J. L.* 574; 189 *Atl. Rep.* 662; *Alberta Contracting Corp.* v. *Santomassimo,* 107 *N. J. L.* 7; 150 *Atl. Rep.* 830.

(2) *Where the Use of an Automobile or Other Form of Vehicle is Required in the Performance of the Contract of Service.* The law is well settled in this state that an employe, authorized or required to use an automobile by his employer in the fulfilling of his contract of service, is still within the course of his employment while driving from the point of last call to his home where the car is garaged. *Demerest et al.* v. *Guild et al.,* 114 *N. J. L.* 472; 176 *Atl. Rep.* 558; *Sanford* v. *Charles H. Totty Co.,* 110 *N. J. L.* 262; 164 *Atl. Rep.* 458; *Auer* v. *Sinclair Refining Co.,* 103 *N. J. L.* 372; 137 *Atl. Rep.* 555.

(3) *Traveling Salesmen and Others Whose Duties Require Them to Travel from Place to Place.* As an accepted rule in this as well as most other jurisdictions traveling salesmen are regarded as acting in the course of their employment so long as they are traveling in the interest of their employer's business, including the whole period of time between their starting from and returning to their place of business or home. *Foley* v. *Home Rubber Co.,* 89 *N. J. L.* 474; 99 *Atl. Rep.* 624. Within this rule the traveler, when overtaken by night, may reasonably seek the protection of an inn and still be regarded as acting within the course of his employment. *California Casualty Indemnity Exchange* v. *Industrial Accident Commission of California,* 53 *Pac. Rep.* (2d) 758.

(4) *Necessary Travel While on Special Duty After Regular Working Hours.* In his ordinary work, the employe knows that he has to be at the proper place at a specified time to begin his services and continue then until a set time. Prior to the time set for beginning the service and after the services are ended for the day, the employe's time is his own, and he may dispose of it as he pleases. But if, while so off duty from his regular employment, he is called to do an errand or sent on a mission by the employer, the courts which have spoken on the subject hold it a special service begun the moment the employe leaves his home, or. the place where the call comes to him, and ended only with his return. Such special employment, so begun and ended, may be implied

from the surrounding circumstances. *Nehring* v. *Minnesota Mining and Manufacturing Co.,* 258 *N. W. Rep.* 307; *State Compensation Insurance Fund* v. *Industrial Accident Commission of California,* 264 *Pac. Rep.* 514; *Reisinger-Siehler Co.* v. *Perry,* 165 *Md.* 191; 167 *Atl. Rep.* 51.

Tested by these well established principles as enunciated by the authorities in the above cited cases, it appears quite clear from the evidence in the case at bar that Rafferty's employment properly falls within the classification under group 2, 3, and 4, exceptions to the general "coming to and returning from work" rule. The field of his employment, measured and limited, not by material space, but by his ability and resourcefulness to find, interest and retain as customers, persons and firms interested in the products of his employer, in a sense was boundless. His duties were indeed multitudinous. Robert M. Mason, sales manager and decedent's immediate superior, testified that although Rafferty's efforts in the main were devoted to selling, he (Rafferty) also acted in the capacity of contact man and trouble shooter, and was frequently called upon to represent the respondent at banquets. While thus authorized and expected to entertain prospects and to attend dinners given by the trade where there was reasonable likelihood of securing new customers or of creating a spirit of good will with old customers, decedent's time and the methods employed were his own. Under such circumstances, the attendance by Rafferty at the banquet at the Pennsylvania Hotel during the early part of the evening on December 1st, 1936, and later at the informal party at the Hotel New Yorker, was in the nature of a special duty; his employment did not have its inception upon his arrival at the first hotel, nor did it end immediately upon his departure from the second hotel. It began the instant he left the respondent's office to drive down to the Pennsylvania Hotel and continued during his stay at the banquet, during his travel enroute to Hotel New Yorker, during his stay there at the informal party given by his colleague, and during his travel from the latter hotel to his home in Maplewood. Unfortunately, through tragic circum-

stances, Rafferty never reached his home because it was while enroute that he met with this horrible accident.

The accident arose in the course of his employment because it occurred while he was returning to his home after the performance of a special duty for his employer. The accident arose out of his employment because it was the result of a risk directly related to conditions peculiar to the special nature of his employment. In the discharge of his services he was furnished an automobile by his employer; and the danger incident to the use of such automobile was a causative danger peculiar to his work; especially so, after long hours of extra service producing mental and physical fatigue which increased the hazards of auto travel. When the decedent turned off the main highway upon reaching Jersey City and thereafter parked his car along Hudson street, presumably because of the urge for sleep, his act in doing so cannot be considered a deviation because the very reason leading to such a course was a condition brought about by his employment, namely lack of proper rest and sleep after twenty or more hours of continual duty. In *Matter of Connelly* v. *Samaritan Hospital*, 259 *N. Y.* 137, it was held: "Whenever conditions attached to the place of employment or otherwise incident to the employment are factors in the catastrophic combination, the consequent injury arises out of the employment."

A case somewhat similar in point is that of *Ford Motor Co.* v. *Industrial Commission of Utah*, 231 *Pac. Rep.* 432, which was a proceeding to procure an award of compensation for the dependents of an employe of the defendant who sustained fatal injuries in an automobile accident, dying the following day. At the hearing of this proceeding it was found by the commission that the accident arose out of and in the course of the decedent's employment, and an award was made accordingly. The sole question involved on appeal was whether this finding was supported by substantial legal evidence. It appeared that decedent was employed by defendant as a road salesman, but that his duties included the promotion of sales activities among retail dealers operating under the state branch of the defendant company. On

the day of the accident which caused his death he was instructed by his manager to drive one of the cars made by defendant to a nearby city where defendant had an agency and there endeavor to induce the local manager to take up the sale of a new model of defendant's car. During that day decedent and the local manager aforesaid discussed the proposition which decedent brought out at some length, both while driving about the city and while at a hotel. Up to ten o'clock that evening no decision had been reached. At that time a suggestion was made that the men go to a dance which was being held in a nearby town. This plan evidently extended to one to take along a party including several ladies and it was on the drive undertaken for this purpose that the fatal accident to the decedent occurred. Defendant's local manager testified at the hearing that while it was not his purpose to sell a car to the ladies whom he invited to accompany them, he knew they were going to buy a car and thought that he would like to show them this one. In affirming the award by the commission the court pointed out that since decedent was in attendance upon the local dealer for the express purpose of persuading him to take a car and since he admittedly labored all day long without closing a contract and was still so engaged when the ride in the demonstration car was suggested, it was but a reasonable act in furtherance of the defendant's purpose in sending the decedent there to comply with the wish of the local manager, even to the extent of attending the dance in the company of the manager's friends. The fact that these friends were taken along did not change the purpose or the nature of the ride, at least so far as decedent was concerned. He did what any good salesman would have done under the circumstances and it is a reasonable and legitimate inference to say that what he did was primarily for the sale of the car.

Also in the more recent cases of *Kelliher* v. *New Haven Clock Co.* (*Conn.*), 186 *Atl. Rep.* 559, and *Kelly* v. *Ochiltree Electric Co.* (*Pa.*), 190 *Id.* 166, the same principle was followed:

"Death of sales manager, whose territory included entire

United States, and whose traveling expenses were paid by employer, killed in automobile accident between two and three A. M., in Morristown, Pennsylvania, while he was driving from employer's office in New Haven, Connecticut, to attend buyers' convention at Cleveland, Ohio, with employer's permission, held compensable as arising in course of employment." *Kelliher* v. *New Haven Clock Co., supra.*

"Death of salesman killed without the state while returning from convention of salesmen's club held compensable, on ground salesman was performing services for employer, where employer organized club to promote sales by limiting membership to leading salesmen, offering various benefits to members, and furnishing instructions and arranged for trip and paid expenses." *Kelly* v. *Ochiltree Electric Co., supra.*

In reaching its conclusion the court stated the following:

"It appears that the sole controversy in this case hinges on the question as to whether or not the decedent was in the course of his employment at the time of his fatal accident, and we are of the opinion that the referee's findings of fact are warranted by the evidence. However, we are of the opinion that the evidence warrants a finding of fact that from the time decedent started from Pittsburgh, Pennsylvania, to attend the convention of the defendant company at Miami, that he was at all times subject to the control and direction of the defendant. The evidence shows that from the time he was summoned to attend the dinner at Pittsburgh, the evening before the caravan of automobiles started for Florida, he was charged with a great many duties for the benefit of his employer. The employer paid all the expenses, mapped out the itinerary, expected him to stop at certain hotels, attend the meetings, and mingle with other salesmen, and all this was for the purpose of building up and improving the sales organization of the defendant company." *Kelly* v. *Ochiltree Electric Co., supra.*

In the very recent case of *John Prino, Prosecutor,* v. *Auslin Co., Defendant,* 120 *N. J. L.* 19; 197 *Atl. Rep.* 731, Mr. Justice Heher, speaking for the Supreme Court, applied the following rule:

"The criteria of a compensable accidental injury are, first, was the employment one of the contributing causes without which the accident would not have happened; and, second, was the accident one of the contributing causes without which the injury would not have been sustained. In appraising the evidence, probability and not certainty is the touchstone. *Furferi* v. *Pennsylvania Railroad Co.*, 117 *N. J. L.* 508; *Jackson* v. *Delaware, Lackawanna and Western Railroad Co.*, 111 *Id.* 487; *Kuczynski* v. *Humphrey*, 118 *Id.* 321."

The respondent, urging that the petitioner has failed in her proofs to make out a case under the Workmen's Compensation act, contends that the accident and resulting death were due to conditions unrelated to Rafferty's employment, to wit, the act of falling asleep and intoxication. I find little or no merit in this contention. Sleep may be a precipitating factor in causing an accident within the purview of the act, especially as in the instant case where it is induced by lack of rest after long hours of extra service. It was so held in the case of *Dixon* v. *Andrews*, 91 *N. J. L.* 373; 103 *Atl. Rep.* 410. The facts in that case, as stated by the court in its syllabus, are as follows:

"On August 15th, 1916, the husband of the petitioner was a farm hand, whose particular employment on that day was to make a trip to Philadelphia with a truck wagon drawn by a team of mules. He left the farm between five and six o'clock in the afternoon, and at two o'clock the next morning was found dead sitting on the seat of the truck with his body crushed between the seat and the overhanging roof of a shed under which the mules were standing.

"From the circumstantial details in evidence, the judge of the Pleas determined that the decedent's death was caused by an accident and that such accident arose out of and in the course of his employment."

Mr. Justice Garrison, speaking for the Supreme Court, delivered the following opinion:

"The court was justified in finding that the injury of which the decedent died was not intentionally self-inflicted or the result of his intoxication. This left two hypotheses upon

which to account for the manner in which such injury was caused, viz., that the deceased was asleep when the mules went under the low roof, or that he was negligent if he was awake. The latter hypothesis need not be considered, inasmuch as negligence is no bar to the recovery of compensation.

"The main contention is that the injury was not accidental if the decedent was asleep; the argument being that sleep is not an accident. The act of going to sleep may or may not be an accident, depending upon whether or not it was designed; but the failure to wake up in time to avert a catastrophe is an accident in every sense of the word. If the going to sleep was not designed, it was accidental; if it was designed, it was negligence. In any event, the undesigned failure of the deceased to wake up until he was crushed between the seat and the low roof was purely "accidental" in the sense in which the term is constantly and correctly employed. Falling out of bed asleep is an accident even if the sole design in going to bed was to go to sleep. The sole case in which falling asleep is clearly not within an employment is that of a watchman or similar service where the servant is employed expressly to stay awake. In such case the failure of the servant to do the one thing he was specially employed to do is in effect an abandonment of his employment. Such seems to have been the recent case of *Gifford* v. *Patterson*, 222 N. Y. 4.

"The judgment of the Burlington County Common Pleas is affirmed, with costs."

While it may be conceded that Rafferty had indulged in cocktails with other guests during the evening's festivities, there is not one scintilla of evidence purporting to show that he was intoxicated or in a semi-intoxicated state during the entire evening. The testimony of Dr. Alex O. Goettler, noted toxicologist, indicating that a post mortem examination revealed .06 per cent. of grain alcohol in the brain of deceased, falls short in giving rise to any reasonable inference that Rafferty was intoxicated at the time of the accident or immediately prior thereto. Dr. Goettler, by his own method of classification of the various stages of intoxication,

testified that one with a content of .06 per cent. alcohol in the brain is not in a state of intoxication but is comparable to a person having had one or two drinks.

The burden of proof which rests upon the petitioner to establish her right to compensation has been met. The evidence furnishes a basis of rational inference, tantamount to legal proof of the fact that decedent's death resulted from an accident which arose out of and in the course of his employment, with the respondent.

I find, therefore, that the petitioner and her two infant children, Diane Marie Rafferty, a daughter, and William Francis Rafferty, a son, all of whom were actual members of the decedent's household at the time of the accident and death and wholly dependent upon deceased for support and maintenance, are entitled to compensation from the respondent as total dependents, together with allowances for statutory burial in the sum of $150.

\*      \*      \*      \*      \*      \*      \*

JOHN J. STAHL,
*Deputy Commissioner.*