962 A.2d 1114 (2009)
404 N.J. Super. 542
Doris SEXTON, Petitioner-Appellant,
v.
COUNTY OF CUMBERLAND/CUMBERLAND MANOR, Respondent-Respondent.
DOCKET NO. A-6414-06T1.
Superior Court of New Jersey, Appellate Division.
Argued September 29, 2008.
Decided January 9, 2009.
*1115 Christine DiMuzio Sorochen argued the cause for appellant (Hoffman DiMuzio, attorneys; Kenneth A. DiMuzio, Sr., Woodbury, on the brief).
Robert G. Malestein, Vineland, argued the cause for respondent County of Cumberland/Cumberland Manor (Lipman, Antonelli, Batt, Dunlap, Wodlinger & Gilson, attorneys; Mr. Malestein, on the brief).
Cheryl B. Kline, Deputy Attorney General, argued the cause for respondent Second Injury Fund (Anne Milgram, Attorney General, attorney; Ms. Kline, on the brief).
Before Judges LISA, SAPP-PETERSON and ALVAREZ.
The opinion of the court was delivered by
LISA, P.J.A.D.
The sole issue in this workers' compensation case is whether Doris Sexton's alleged aggravation of her preexisting chronic obstructive pulmonary disease (COPD), caused by inhaling a particular perfume sprayed by a co-employee in her employer's workplace on three occasions on the same day, arose out of the employment. The judge of compensation reasoned that because the alleged reaction to the perfume was the result of a personal proclivity of Sexton, any aggravation of her preexisting condition did not arise out of the employment. We disagree and reverse.
At the time of the January 3, 2004 accident, Sexton was sixty-four years old and a part-time licensed practical nurse at Cumberland Manor, a nursing home operated by the County of Cumberland. She worked weekends from 7:00 a.m. to 3:00 p.m. She had previously worked there from the late 1970s until the early 1980s, and then resumed on a part-time basis in the late 1990s.
On Saturday, January 3, 2004, Sexton arrived at work at 6:45 a.m., relieved the nurse from the prior shift, and began her usual work routine, dispensing medications in A hall. Sometime after 10:00 a.m., she went to B hall, where she detected the smell of a perfume in the air. She continued her work and by late morning went to the day room to dispense medications and feed residents. A nurse's aide sprayed the same perfume in the air. Sexton experienced difficulty breathing. She hurriedly *1116 completed her assigned task and left the day room. She proceeded directly to the nurse's station and reported what happened to the supervising nurse. Sexton told her she could not get her breath and was experiencing a breathing problem. Because of Sexton's breathing difficulties, another nurse performed Sexton's afternoon rounds, beginning at about noon. Sexton spent the remainder of her shift seated, doing desk work. As she described it, "I did some paperwork, some charting, and I didn't get up and move around because I was having a problem."
Just before Sexton completed her shift at 3:00 p.m., the nurse's aide who had previously sprayed the perfume was seated at a nearby desk and again sprayed it. Upon smelling it, Sexton "got away from her ... went over to count the narcotics with the nurse going out" and immediately clocked out, left the building, and began walking to her car. She was unable to reach her car because she was "breathless." She sat on a bench outside of the building for about twenty minutes. She then walked to her car and sat there "a good long while." She then made the twenty minute drive home, arriving at about 4:30 p.m. She went directly to bed.
The next morning, Sexton's breathing difficulties continued. Her daughter transported her to a local hospital. The hospital record stated that she was admitted due to complaints of shortness of breath resulting from exposure to perfume at work. She was discharged on January 16, 2004. Her discharge summary diagnosis was acute pulmonary disease exacerbation as a result of being exposed to odors at work. From the hospital, Sexton was transferred to a rehabilitation center until January 23, 2004, after which she was transferred to a different hospital until January 30, 2004.
Since then, Sexton has been oxygen-dependent on an almost constant basis and has never returned to work. Prior to January 3, 2004, she had an active lifestyle and worked regularly. The judge of compensation found that since then her "physical health and abilities have radically deteriorated," and her life activities have been greatly curtailed.
Before January 3, 2004, Sexton smoked an average of one pack of cigarettes per day for forty-three years. She has not smoked since then. She was diagnosed with COPD as early as 1989, and she used an inhaler as needed.
The judge of compensation heard medical testimony from a pulmonary expert for each side. Sexton's expert opined that Sexton's preexisting COPD was exacerbated by the perfume inhalation and two episodes of intubation during her second hospitalization, rendering her totally and permanently disabled. Respondent's expert opined that Sexton's perfume exposure "was not a relevant factor" in her current level of disability and that the intubations might have caused only a temporary worsening of her condition. He found Sexton's overall pulmonary disability was 75% permanent partial disability, none of which was attributable to the perfume exposure or the intubations.
Because the judge of compensation determined that any aggravation of Sexton's preexisting condition was not compensable, he did not make findings on the causation issue. Instead, he dismissed Sexton's petition against her employer and the Second Injury Fund. See N.J.S.A. 34:15-95.
In a thorough and thoughtful opinion, the judge of compensation found that the perfume exposures constituted accidents, see N.J.S.A. 34:15-7, not occupational exposures, see N.J.S.A. 34:15-30, -31. He found that the accidents occurred in the course of Sexton's employment. The remaining criterion for compensability, therefore, required a determination of *1117 whether the accidents arose out of the employment. See N.J.S.A. 34:15-7 (rendering compensable injuries to employees caused "by accident arising out of and in the course of employment").
Relying primarily on Coleman v. Cycle Transformer Corp., 105 N.J. 285, 520 A.2d 1341 (1986), the judge of compensation concluded that no condition of employment or of the employer's premises played a role in Sexton's accident. He found "that the presence of a perfume sprayed by a co-employee on the employer's premises does not equate to such a condition." He further found "that the probability of the aggravation of [Sexton]'s preexisting pulmonary condition due to the perfume exposure at work was no greater than it would be under the normal circumstances of life." He noted, for example, that the medical records revealed that in 1995 Sexton had experienced a reaction to an exposure to perfume, although it did not result in her hospitalization.
The factual findings of the judge of compensation were essentially as we have set forth. They are well supported by the record, see Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965); De Angelo v. Alsan Masons, Inc., 122 N.J.Super. 88, 89-90, 299 A.2d 90 (App.Div.), aff'd o.b., 62 N.J. 581, 303 A.2d 883 (1973), and are not disputed by Sexton. It is the legal consequences flowing from those facts that form the basis of Sexton's appeal. We owe no particular deference to the judge of compensation's interpretation of the law. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995); see also Verge v. County of Morris, 272 N.J.Super. 118, 123, 639 A.2d 378 (App.Div.1994) (holding that if a judge of compensation mistakenly applies the law to the facts, an appellate court "must grant appropriate relief").
In Coleman, supra, 105 N.J. at 286-87, 520 A.2d 1341, during an unpaid one-half hour lunch break, the employee ate her lunch, which she brought from home, in the employees' lunchroom. The employer did not serve or provide food, and employees were free to remain on or off the premises during their lunch break. Id. at 287, 520 A.2d 1341. After eating her lunch, the employee struck a match to light a cigarette, but as she turned her head, the match caught her hair on fire causing her injuries. Ibid.
The dispositive issue was whether the accident, which occurred in the course of her employment, arose out of the employment. Id. at 286, 290, 520 A.2d 1341. The judge of compensation "concluded that the accidental touching of a lighted match to the petitioner's hair by the petitioner's own hand was not `reasonably incidental' to her employment." Id. at 287, 520 A.2d 1341. "He concluded: `Neither the tasks of her employment, nor the place where she was eating her lunch at the time, nor any act on the part of any of her co-employees caused her injury,' and therefore `the accident did not arise out of' the employment." Ibid. We reversed, but the Supreme Court reversed our decision and reinstated the decision of the judge of compensation. Id. at 286-88, 520 A.2d 1341.
The Court noted that, in analyzing the criteria for compensability in N.J.S.A. 34:15-7, it is useful to consider the two key terms separately, "with the `arising out of' portion construed to refer to causal origin, and the `course of employment' portion to the time, place, and circumstances of the accident in relation to the employment." Id. at 288, 520 A.2d 1341 (quoting 1 A. Larson, Workmen's Compensation Law, § 6.10 (1985)). The Court explained:
The accident, in order to arise "out of" the employment, must be of such nature the risk of which might have been contemplated by a reasonable person when *1118 entering the employment, as incidental to it. A risk is incidental to the employment when it belongs to or is connected with what a workman has to do in fulfilling his contract of service.

[Id. at 289, 520 A.2d 1341 (quoting Rafferty v. Dairymen's League Coop. Ass'n, 16 N.J. Misc. 363, 366, 200 A. 493 (Dep't Labor 1938)) (emphasis added).]
The Court cautioned that although "arising out of" and "in the course of" employment are separate tests that must be independently applied and met, "it should never be forgotten that the basic concept of compensation coverage is unitary, not dual, and is best expressed in the term `work connection.'" Ibid. (quoting Larson, supra, at § 6.10).
To find the requisite causal connection between the employment and the injury, "[i]t must be established that the work was at least a contributing cause of the injury and that the risk of the occurrence was reasonably incident to the employment." Id. at 290, 520 A.2d 1341. New Jersey has adopted the "but for" or "positional-risk" test. Ibid. "`But for' connotes a standard of reasonable probability. Thus stated, the question is whether it is more probably true than not that the injury would have occurred during the time and place of employment rather than elsewhere." Howard v. Harwood's Rest. Co., 25 N.J. 72, 83, 135 A.2d 161 (1957).
Analysis under this test requires consideration of the nature of the risk that caused the injury. Coleman, supra, 105 N.J. at 291, 520 A.2d 1341. Three categories have been described: (1) those distinctly associated with the employment, such as fingers getting caught in gears or excavations caving in; (2) neutral risks, consisting of uncontrollable circumstances not originating in the employment environment, such as being struck by lighting or blinded by a flying beetle; and (3) those personal to the employee, in which the employment connection with the injury is minimal and it is the personal proclivities or contacts of the employee that give rise to the harm. Id. at 291-92, 520 A.2d 1341. An example of the third type is an employee attacked while working by an enemy motivated by vengeance stemming from personal contact with the employee. Howard, supra, 25 N.J. at 84-85, 135 A.2d 161. The first two types are compensable; the third is not. Ibid.; Coleman, supra, 105 N.J. at 291-92, 520 A.2d 1341.
In Coleman, the Court concluded that the employee accidentally setting her own hair on fire fell into the third category and therefore did not arise out of the employment. Supra, 105 N.J. at 292, 520 A.2d 1341. The employee did not have to be in the lunch room during her unpaid lunch break and did not have to light a match or smoke in order to fulfill her contract of service. Id. at 287, 520 A.2d 1341. Therefore, the risk she encountered was not incidental to the employment. No condition of the work or the workplace was a contributing cause of her injury. Id. at 294, 520 A.2d 1341. Accordingly, the requisite causal connection was not present. Id. at 294-95, 520 A.2d 1341.
As part of its analysis, the Coleman Court considered idiopathic fall cases, in which injuries resulting from a fall occasioned by purely personal proclivities were found compensable. Id. at 292-94, 520 A.2d 1341. In one, the employee suffered an epileptic seizure and fell against a pot stove, burning his face. Reynolds v. Passaic Valley Sewerage Comm'rs, 130 N.J.L. 437, 438-39, 33 A.2d 595 (Sup.Ct.1943), aff'd o.b., 131 N.J.L. 327, 36 A.2d 429 (E. & A.1944). The pot stove was furnished by the employer, and the "thing that occurred was connected with the service the employee had to perform in fulfilling his contract." Coleman, supra, 105 N.J. at 293, 520 A.2d 1341 (quoting Reynolds, supra, *1119 130 N.J.L. at 441-42, 33 A.2d 595). Although the cause of the fall was unconnected with the employment, the pot stove was a condition of the place of employment and contributed to the injury to the employee's face, as a result of which the injury was caused by a risk incidental to the employment and thus arose out of the employment. Ibid.
In George v. Great Eastern Food Products, Inc., 44 N.J. 44, 207 A.2d 161 (1965), the Reynolds rationale was extended to find compensability for an employee who fell because of a non-occupational heart attack, struck nothing on the way down, and hit his head on a level concrete floor, causing a fractured skull that later resulted in his death. In reaching that conclusion, the Court overruled its earlier contrary holding in Henderson v. Celanese Corp., 16 N.J. 208, 108 A.2d 267 (1954), reasoning that an accident arises out of the employment "when it is due to a condition of the employment-i.e., a risk of this employment, and that the impact with the concrete floor here clearly meets that test." George, supra, 44 N.J. at 48, 207 A.2d 161. In other words, the level concrete floor, like the pot stove in Reynolds, was a condition of the place of employment, and it was a contributing cause of the employee's skull fracture.
Contrasting those cases to the facts before it, the Coleman Court concluded:
The same cannot be said of the accident and injury in the case before us. No condition of the lunchroom played any role, in petitioner Coleman's setting her hair on fire or in the nature and extent of her injury. No employment-related instrumentality, such as the stove in Reynolds ... or the concrete floor in Henderson ... and George ..., influenced the occurrence itself or the nature and extent of the resultant injury. Unlike Gargiulo [v. Gargiulo, 13 N.J. 8, 97 A.2d 593 (1953)], in which the requirements of the employee's task took him into the line of fire of an errant arrow [shot by a neighborhood boy while the employee was working in the back yard of his employer's store], no circumstances of this petitioner's employment [were] causally related to the unhappy introduction of match to hair. The fact that the accident happened while she was on her employer's premises was the sheerest happenstance, wholly insufficient to supply the necessary nexus between the employment and the accident.
To hold otherwise would be to equate an "incident of employment" with a coincidence. There is not the slightest suggestion that it is more probable that the accident would not have occurred under the normal circumstances of everyday life outside of the employment.... Quite simply, it was the [petitioner's] personal proclivity for smoking, coupled with an unfortunate bit of inattention, that produced the harm.
[Coleman, supra, 105 N.J. at 294-95, 520 A.2d 1341.]
The Court confirmed its conclusion by reference to the so-called "smoking" cases. Id. at 295-96, 520 A.2d 1341. In one, injuries caused when a garage attendant spilled gasoline on his work clothes at work, which caught fire when he attempted to light a cigarette, were found to arise out of employment. Secor v. Penn Serv. Garage, 19 N.J. 315, 324, 117 A.2d 12 (1955). The result was the same for an employee whose clothing, coated with oil from his job, caught fire when matches in his pocket ignited when he bumped into a locker. Steel Sales Corp. v. Indus. Comm'n, 293 Ill. 435, 440, 127 N.E. 698 (1920). However, compensation was denied for an employee who, while driving a truck in the course of his employment, attempted to light a cigarette and the match head flew off into his eye. HillLuthy *1120 Co. v. Indus. Comm'n, 411 Ill. 201, 205, 103 N.E.2d 605 (1952). In that case, the risk of using matches or smoking was not incidental to the employment but was unconnected to it. The Court concluded that the result in each of those three cases "was determined by the presence or absence of a risk of the employment or a condition thereof but for which the accident would not have happened...." Coleman supra, 105 N.J. at 296, 520 A.2d 1341.
In the case before us, the judge of compensation concluded that Sexton's injury was the result of her personal proclivity, namely her underlying COPD and sensitivity to a particular perfume, and that the perfume exposure could have happened anywhere in every day life. He therefore concluded that the risk was of the non-compensable third category, a risk personal to the employee. We disagree.
First, we consider the Court's explanation in Howard, supra, 25 N.J. at 85, 135 A.2d 161, of the two-step process by which the positional risk test must be analyzed. For purposes of its analysis, the Court accepted the factual proposition that the vicious attack on the injured employee by a co-employee was motivated by the attacker's insane delusional impulse in thinking he was punishing his common law wife for a wrong she may have done or that he thought she had done. Id. at 78, 81, 135 A.2d 161.
In the first step, it must be determined "whether but for the fact of employment the injury would not have happened." Id. at 85, 135 A.2d 161. The "positional relation of the employment to the injury" was plainly established because had the victim not been at work that day she would not have been attacked by her co-employee. Ibid.
The second step evaluates the "nature of risk involved." The Court found a sufficient nexus of the risk to the employment:
[The employer] ... urges that irrational impulses of workmen over which the employer has no control cannot be said to be a risk connected with the employment. But that argument will avail little, because even if the risk is not one directly related to the employment, it may at least be classified as neutral. We cannot with any rational degree of consistency say that an arrow shot by a boy onto the employer's premises is causally related to the employment, while an assault and battery committed upon an employee by an insane co-employee is not. The employer's lack of control over the source of the harm is obvious in either situation, and at least in the instant case it may be said that the employer placed [the co-employee attacker] in a position to do harm.
[Id. at 86, 135 A.2d 161.]
In the case before us, Sexton plainly would not have been exposed to the perfume if she had not been at work on January 3, 2004. The first step is satisfied. The nature of the risk was that a co-employee might do something that could injure Sexton. The specific nature of the injurious conduct need not be foreseen. A co-employee might irrationally attack her, accidentally bump into her, or spill a slippery substance on the floor on which she might slip and fall. As it happened, a co-employee repeatedly sprayed perfume in Sexton's presence, allegedly injuring her. The employer placed the co-employee in a position to do harm.
Next, we distinguish the material facts in this case from those in Coleman. Here, the alleged injury was not self-inflicted, but caused by a co-employee. It did not occur when Sexton was on an unpaid break in a place she was not required by her employer to be. Sexton was performing her assigned duties as required by her employment at the time of each exposure. *1121 She was fulfilling her contract of service. Once sprayed into the air, the perfume became part of the workplacea condition of the workplaceno different than the pot stove in Reynolds or the concrete floor in George. Sexton's contact with the air she was breathing in her employer's premises was no different than the contact of the employees in Reynolds and George with "conditions" of their places of employment. Thus, a condition of the workplace did play a role in Sexton's alleged injury. An employment-related instrumentality (the contaminated air) did play a role in the occurrence.
To say that this exposure just as easily could have happened in the ordinary circumstances of every day life gives only a mechanistic application of the literal terms of the positional risk test. The same could be said about the idiopathic fall cases. The employees in Reynolds and George just as easily could have had their episodes at a shopping mall or at home, and in falling struck an object on the way down or simply fell directly to the floor. But they did not. They hit the object or the floor in the workplace while working. That was the risk of their particular employment.
The same is true here. The air Sexton had to breathe in order to fulfill her contract of service, contaminated by a co-employee, was a condition of the employment for Sexton and thus a risk of "this" employment for her. George, supra, 44 N.J. at 48, 207 A.2d 161. Therefore, if inhaling the substance injured her, the injury arose out of the employment. As in Howard, supra, 25 N.J. at 86, 135 A.2d 161, no principled distinction can be drawn between the typical neutral risks resulting from an act of God or emanating from some other non-work-related source or person and this occurrence. As in Howard, what happened to Sexton can be deemed a neutral risk. Ibid.
This situation is readily distinguishable from Coleman and Hill-Luthy. In those cases, the risk of striking a match and lighting a cigarette had no relationship to the work. No risk or condition of the employment contributed to the injury, which in each case was self-inflicted.
Finally, we consider whether Sexton's underlying COPD is the kind of personal proclivity that should push her into the non-compensable third category of risks. The judge of compensation concluded that because Sexton's condition made her particularly sensitive to the perfume the risk of harm to her from exposure to the perfume was specific to her or to anyone else with that sensitivity, as a result of which her harm was caused by her personal proclivity. For the reasons that follow, we cannot accept this rationale.
The Workers' Compensation Act is social legislation and is liberally construed to accomplish its beneficent purpose of providing coverage to as many workers as possible. Brower v. ICT Group, 164 N.J. 367, 373, 753 A.2d 1045 (2000). Employers take their employees as they find them, "with all of the pre-existing disease and infirmity that may exist." Verge, supra, 272 N.J.Super. at 125, 639 A.2d 378. Accordingly, employees are "not disqualified under the requirement that the injury arise out of the employment where the pre-existing condition is aggravated, accelerated or combined with the pre-existing disease or infirmity to produce the disability for which compensation is sought." Id. at 126, 639 A.2d 378.
The Second Injury Fund (Fund) allows employers a credit if a work accident accelerates or aggravates a preexisting condition, resulting in total and permanent disability. N.J.S.A. 34:15-95; N.J.S.A. 34:15-12(d). Through this statutory scheme, "[t]he Fund assumes liability for the portion of the disability attributable *1122 to the preexisting impairment." Lewicki v. N.J. Art Foundry, 88 N.J. 75, 83-84, 438 A.2d 544 (1981). "The intent of the Fund is to `encourage the hiring by industry of people handicapped by pre-existing disabilities....'" Id. at 83, 438 A.2d 544 (quoting Paul v. Baltimore Upholstering Co., 66 N.J. 111, 129, 328 A.2d 610 (1974)). "Granting an employer credit for previous loss of function under N.J.S.A. 34:15-12(d), while allowing the employee to recover from the Fund for unassignable previous permanent disability, allows full compensation to the employee while removing the disincentive to hiring workers with pre-existing conditions." Gulick v. H.M. Enoch, Inc., 280 N.J.Super. 96, 116, 654 A.2d 987 (App.Div.1995).
As we have explained, the "arising out of" criterion is satisfied if it is "established that the work was at least a contributing cause of the injury and that the risk of occurrence was reasonably incident to the employment." Coleman, supra, 105 N.J. at 290, 520 A.2d 1341. In the context of aggravation of a preexisting condition, the corollary to that rule is that disqualification under the "arising out of" criterion occurs when the preexisting condition is the sole cause of the injury for which compensation is sought. Spindler v. Universal Chain Corp., 11 N.J. 34, 39, 93 A.2d 171 (1952); Shaudys v. IMO Indus., Inc., 285 N.J.Super. 407, 414-17, 667 A.2d 204 (App.Div.1995); Verge, supra, 272 N.J.Super. at 128-29, 639 A.2d 378. Verge supra, 272 N.J.Super. at 128-29, 639 A.2d 378 (holding that an employee with preexisting knee injuries could recover under the "directly associated" risk category if she reinjured it by slipping on a rug at work, but that she could not recover if her employer proved the knee simply "gave-out due to an idiopathic or personal cause").
We think characterizing Sexton's underlying COPD as a personal proclivity that disqualifies her from coverage under the "arising out of" criterion, when the COPD was not the sole cause of her claimed injury, but was allegedly aggravated by a work-related risk, would be antithetical to the principles and policies we have described. Accordingly, we conclude that Sexton's alleged injury arose out of the employment, and we reverse the judgment dismissing her petition against her employer and the Fund. We remand to the Division of Workers' Compensation for further proceedings.
Reversed and remanded.